**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

|  |  |  |
|---|---|---|
| MAURICE SPORTING GOODS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No _____ |
| v. | ) | |
| | ) | |
| READ SAMPLES, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff, Maurice Sporting Goods, LLC, by its attorneys, Harris Winick Harris LLP, for its Complaint against Defendant Read Samples states as follows:

**THE PARTIES**

1. Plaintiff Maurice Sporting Goods, Inc. is a Delaware corporation with its principal place of business in Northbrook, Illinois. Maurice is in the business of, among other things, distributing sporting goods, and related products.

2. Upon information and belief, Defendant Read Samples ("Samples") is an employee of MSG and a resident of the state Florida with a primary residence of 5831 Country Lakes Drive, Fort Myers, Florida 33905.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendant are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court also has jurisdiction over Read Samples as, upon information and belief, Mr. Samples is a resident of the State of Florida and this District.

5. Paragraph 9 of the Restrictive Covenant Agreement (as defined below) provides:

> <u>Jurisdiction and Venue</u>. This Agreement is to be construed pursuant to the laws of the state of Florida. Company and Employee agree to submit any claim arising from this Agreement to the venue of Lee County, Florida.

6. Venue is proper in this District because the parties selected this county for the forum and some of the defendant's acts occurred in the Middle District of Florida.

7. Venue also is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (b)(2).

## FACTUAL BACKGROUND

8. Plaintiff Maurice Sporting Goods, Inc. ("MSG") is a corporation organized and existing under the laws of the State of Delaware and having a principal place of business in Northbrook, Illinois.

9. MSG is a privately-owned wholesaler of sporting goods products that was founded in Chicago by Maurice Olshansky in 1923 as a store front selling recreational goods. Since then, MSG and its subsidiaries have become one of the largest distributors, manufactures, in-store service of outdoor sporting goods in North America including fishing, shooting and athletic goods, with five warehouse locations in the United States and Canada. MSG serves mass retailers and independent dealers throughout the United States and other international markets through a portfolio of sourcing and manufacturing companies containing recognizable brands including marine products from its subsidiaries Shoreline Marine and Propel Paddle Gear.

10. In 2014, in an effort to expand its marine business and product offerings, MSG acquired First Source Marine ("First Source") out of Fort Myers, Florida. First Source had been co-founded in 2004 by Samples and Steve Arnold ("Arnold") as a direct import source, with deep overseas relationships, that helped to design, manufacture, package, test, and supply companies with marine and paddle sports products.

2

11. Following the acquisition, First Source became a subsidiary division of MSG which, together with the Shoreline Marine and Propel Paddle Gear subsidiaries formed the marine business divisions of MSG.

12. Among other things, the acquisition of First Source by MSG was facilitated by the execution of a settlement note in favor of a supplier called Signet Products Limited ("Signet"). Signet was owned by Steve Arnold and had served as the primary source of products and supplies for MSG's Shoreline Marine subsidiary. Following the acquisition, Signet remained the sourcing agent for the majority of MSG's marine-related products.

**MSG's Employees and Employment Contracts**

13. Read Samples served as the General Manager of the First Source subsidiary of MSG.

14. In addition to Samples, the First Source management team included Logan Nelson and Mike Knox (the "FS Management Team").

15. Each member of the FS Management Team, including Samples, entered into non-compete and non-solicitation agreements with MSG (the "Restrictive Covenant Agreements") in exchange for access to the Maurice Sporting Goods, LLC 2019 Bonus Plan for the First Source Division, as amended, restated or otherwise modified from time to time (the "Bonus Plan"), and individual Award Agreements for the Bonus Plan.

16. The Bonus Plan was offered to FS Management Team members "to encourage the Grantee to contribute materially to the growth of First Source and the Company [defined as Maurice Sporting Goods LLC]."

17. As a condition of receiving the award of Bonus Plan Units (as defined in the Bonus Plan), Samples agreed "that any Bonus Plan Units issued hereby shall be subject to the

forfeiture provisions, transfer restrictions and repurchase rights described herein and in the [Bonus Plan]."

18. Among other things, MSG's issuance of Bonus Plan Units was contingent on Samples and FS Management Team members' agreement to "abide by the restrictive covenants set forth in that certain Restrictive Covenant Agreement by and between the Company and the Grantee."

19. Samples signed an Award Agreement and agreed to the provisions set forth therein including the obligation to comply with the terms of the Bonus Plan.

20. The Restrictive Covenant Agreements were effective from the Effective Date for Samples and the other FS Management Team employees throughout the term of the employees' employment plus a one-year period thereafter (defined in the Restrictive Covenant Agreement as the "Term").

21. The Restrictive Covenant Agreements included the following Covenant Not to Compete between the employee and Maurice Sporting Goods LLC (defined therein as "Company"):

> **Covenant Not to Compete.** Employee agrees that, at no time during the Term, will Employee engage in any business activity which is competitive with Company nor work in a role for any company which competes with Company. Further, during the Term, Employee will not for themselves or on behalf of any other person or business enterprise, engage in any business activity which competes in marine accessories with Company (or any of its affiliates to which Employee provided services) in North America.

22. The Restrictive Covenant Agreements also included the following Non-Solicitation covenant for MSG employees:

> **Non-Solicitation (employees/contractors).** During the Term, Employee shall not solicit any employee or independent contractor of Company, either individually or on behalf of any other business

4

> enterprise, and further shall not induce any employee or independent contractor associated with Company to terminate his, her or its employment or engagement with Company, either individually or on behalf of any other business enterprise.

23. The Restrictive Covenant Agreements also included the following Non-Solicitation covenant regarding existing customers, prospective customers, or clients of MSG:

> **Non-Solicitation (customers/prospective customers).** During the Term, Employee shall not solicit any existing or prospective customers or clients of Company (or any of its affiliates), either individually or on behalf of any other business enterprise, and shall not call or attempt to solicit or take away any existing or prospective customer or client from Company.

24. Samples agreed that in the event he breached his obligations under the Restrictive Covenant Agreements, MSG would suffer irreparable harm:

> **Injunctive Relief**. Employee acknowledges that Company will suffer irreparable harm if Employee breaches the obligations under this Agreement. Therefore, if Employee breaches, or threatens to breach by words or actions, any such provision, then Company shall be entitled to injunctive relief, in addition to any other remedies at law or equity, to enforce such provisions.

25. Samples signed a Restrictive Covenant Agreement and agreed to the provisions set forth therein, including the provisions quoted above.

### MSG's Attempt to Sell its Marine Business Subsidiaries

26. In late summer of 2019, MSG decided to sell certain of its assets following various challenges in the marine retail markets. One of First Source's long-term clients, T-H Marine Supplies, LLC ("T-H Marine"), expressed serious interest in purchasing MSG's marine division assets including Shoreline Marine, First Source, and the Propel Paddle Gear division. The negotiations regarding the sale were headed by T-H Marine's Chief Executive Officer, Jeff Huntley, and Keith Jaffee, the Chairman of MSG.

27.     On August 26, 2019, Huntley and Jaffee signed a Letter of Intent ("LOI"), in which they agreed to work toward the sale of the three subsidiaries to T-H Marine for approximately $19 million.

**Samples Undermines MSG's Sale of the Marine Division**

28.     On October 2, 2019, approximately 20 days before the T-H Marine deal was scheduled to close and without any direction from MSG to do so, Samples contacted Huntley via email to request a clandestine conversation about the pending sale. Samples' email indicated that he wanted to discuss with Huntley confidential details regarding what he perceived as weak sales in MSG's marine division and to share his personal concerns regarding MSG's relations with one of its major customers, Walmart. Samples stated that he was "in a [sic] interesting spot, still working for MSG so please do not discuss this with anyone else until we get a chance to talk." Huntley responded the same day stating "I understand we need to discuss offline" and adding that it was "not good news I was hoping to hear." Huntley asked Samples "[w]hy the heck are they performing so bad?"

29.     Two days after the email exchange between Samples and Huntley, T-H Marine notified MSG that it was no longer interested in pursuing the sale, citing concerns about MSG's deteriorating business relationship with Walmart, even though MSG had demonstrated significant uptick in its business with Walmart for the Propel Paddle Gear division's kayak accessories. MSG was left scrambling to find other suitors for its assets.

**Samples' Collusive Plan to Thwart Any Fair Market Sale for MSG's Marine Assets**

30.     Throughout the sales negotiations and solicitations, Read Samples remained in close communication with Steve Arnold of Signet, improperly informing him about potential buyers and the terms of the ongoing confidential negotiations between MSG and those buyers.

The communications demonstrate that Samples was feeding Arnold information so that they could work collusively to engage the FS Management Team in their efforts to undermine MSG's potential sales in three critical ways.

31. First, Samples and Arnold exchanged communications with Jeff Huntley at T-H Marine, improperly sharing with him confidential information relating to the interest of other buyers in MSG's marine subsidiaries and the terms and details of ongoing negotiations. Those communications include offers by Samples and Arnold to work with Huntley to undermine the potential sales so that T-H Marine could ultimately buy MSG's marine assets for next-to-nothing.

32. Second, Samples, Arnold and the rest of the FS Management Team worked in concert to prevent any sale by threatening MSG's source for marine products and supplies. Specifically, internal communications evidence a concerted plan to communicate to potential buyers that Signet would refuse to work with the post-acquisition marine entities, thus effectively cutting off MSG's source of marine products and supplies. In an October 28, 2019 email to Samples, Arnold described their plan as follows: if "Middleton thinks [one potential buyer is] going to buy [First Source] they will not have a supply" and "there will be nothing to buy and nothing to sell with Shoreline."

33. Third, Samples and Arnold also involved other members of the FS Management Team in their plan by threatening a management walk-out if any of the potential buyers (other than T-H Marine) acquired MSG's marine business. On October 30, 2019, for example, Arnold contacted Samples and the FS Management Team about the plan stating that it would facilitate "getting you out of the non-competes" and that "[w]ithout the team there, Jaffee has nothing to

sell…" The plan to threaten a management walk-out was confirmed in later emails among Samples and others.

34. Samples' involvement in and leadership of the destructive plan damaged MSG by preventing MSG from engaging in a fair market sale of its assets: Samples had access to, and demonstrated that he would improperly share, confidential information regarding the terms of potential sales and ongoing negotiations with interested third parties; Samples was knowledgeable about the state of MSG's marine business and demonstrated that he was willing to share it to MSG's material detriment; and Samples was privy to confidential information regarding MSG's relationships with its customers and demonstrated that he would share it to drive down the sale price for MSG's marine division.

**MSG Attempts to Find Alternate Buyers for the Marine Division But Samples' Interference Persists**

35. Samples' interference in the potential sale to T-H Marine and his collusion with Arnold and the FS Management Team to undermine the negotiations had devastating consequences. MSG was forced to go back out to the market to find a potential buyer for its and had limited time to do so.

36. MSG attempted to work with multiple interested purchasers to sell its marine businesses for amounts approaching their true market value. For example, the Folsom Corporation ("Folsom"), a privately-held fishing tackle wholesaler, expressed interest in MSG's Shoreline Marine subsidiary. Folsom and MSG engaged in negotiations during November 2019, but Samples, Arnold, and the FS Management Team continued to undermine MSG's efforts using the tactics and plan described above. For example, in a November 18, 2019 email to the FS Management Team, Arnold confirmed the group's plan that if the ultimate buyer was not T-H Marine/Signet, Signet would stop supplying MSG's marine businesses so Shoreline Marine

would have nothing to sell. Communications during this time also demonstrate that Samples and the FS Management team were planning a management walk-out if the sale was not directed to T-H Marine/Signet, and that the group was trying to negotiate directly with Folsom to cut MSG out of any transaction.

37. Arnold and Huntley partnered together around this timeframe to make a joint T-H Marine/Signet offer to purchase just the First Source subsidiary of MSG's marine business for approximately $2.5 million. Internal company emails reveal that unbeknownst to MSG, Samples (and other members of the FS Management Team) remained in close communication with Huntley (of T-H Marine) and Arnold (of Signet) throughout those negotiations regarding the potential sale. MSG declined the offer as it was well below market value for the First Source subsidiary.

38. MSG also had engaged Waveland Partners (hereinafter, "Waveland") in initial negotiations for the First Source subsidiary. Waveland had expressed interest in purchasing First Source alone for a sum between $4.5 and 5 million. Samples and Arnold expressed their view to MSG that Waveland was not the right buyer. At the time, however, MSG had learned about Samples' conduct and the communications between Samples, his FS Management Team colleagues, Arnold, and Huntley that demonstrated their intention to undermine any sale that did not involve and/or benefit T-H Marine and Signet. Accordingly, because there was no possibility of a fair process in the sale of MSG's marine businesses to Waveland, MSG was forced to terminate negotiations.

39. Samples' conduct, in collusion with the conduct of his FS Management Team colleagues, Arnold, and Huntley, prevented MSG from being able to pursue a true market-value sale for its assets. Accordingly, when on November 19, 2019, T-H Marine made another offer to

9

buy the First Source subsidiary for approximately $2 million, MSG had no other potential buyers and no option but to accept. On February 5, 2020, T-H Marine publicly announced that it had acquired the First Source subsidiary from MSG.

### Samples' Interference Drives Down the Market Price for MSG's Fishing Business

40. Samples' interference and collusive plan not only prevented MSG from obtaining a fair market value for its marine business, but it also fundamentally shifted the sales landscape for MSG's other assets. What MSG had started as an organized sale of the company's assets with ample time and a fair market process was no longer an available option because of credit deadlines and the fact that Samples' interference had pushed back the entire timeline. Accordingly, MSG was forced into a fire sale of its marine business which caused the sales value of its fishing business to plummet.

41. MSG had marketed its fishing business out to multiple different strategic entities with an estimated market value between $25-$35 million. There were multiple interested entities in MSG's fishing businesses, but they pulled out of negotiations after Samples interfered with the T-H Marine deal and Samples, Arnold, and the FS Management team engaged their underhanded plan to prevent any fair sale of the marine divisions. By then it was clear to MSG that it could not sell its fishing subsidiaries intact, so it had to look for options to sell off the inventory to raise capital.

42. In December 2019, MSG received a term sheet from Big Rock Sports ("Big Rock"), a Portland, Oregon based firearms, ammunition, fishing, marine and camping distributor in North America. Big Rock was the only buyer at that point that understood the fishing business and could complete the transaction quickly enough with sufficient liquidity to satisfy MSG's creditors. Big Rock restricted its offer, however, to a consignment deal for the

inventories of the Shoreline and Propel subsidiaries.  In essence, Big Rock agreed to purchase Shoreline and Propel products and supplies on an as-needed basis for as long as those supplies lasted.  The offer for MSG's fishing businesses inventory was approximately $10 million less than the fair market value.

43. In addition to the consignment offer, MSG also requested $1 million for the company goodwill and its relationship with suppliers and customers.  Big Rock refused to offer anything for the company good will.  MSG later learned that Arnold, with Samples' support, had convinced Big Rock to reject MSG's request and to refuse any goodwill payment by communicating to Big Rock that MSG was desperate and had no leverage and that Signet would refuse to supply MSG, thereby undercutting any goodwill value of the MSG/Signet relationship, consistent with the plan concocted by Samples, Arnold and the FS Management Team.

## **COUNT I – BREACH OF CONTRACT**

44. MSG restates and re-alleges Paragraphs 1 through 43 as though fully set forth herein.

45. MSG has performed, or is excused from performing, all of its obligations under the Bonus Plan, the Award Agreement, and the Restrictive Covenant Agreement.

46. Samples had a contractual duty to defend and protect the business interests of MSG.

47. Samples failed to perform his services in accordance with the Bonus Plan, the Award Agreement, and the Restrictive Covenant Agreement by, among other things:

    a. Sharing sensitive and confidential company information potential purchasers with the intent of interfering with and disrupting those potential business negotiations to the detriment of MSG;

    b. Sharing confidential company information without authority to non-approved recipient parties;

    c. Engaging in business activity that was competitive with MSG;

    d. Engaging in business activity with Signet that competed in marine accessories with MSG;

    e. Colluding with and solicited other FS Management Team members to terminate their employment with MSG;

    f. Colluding with and/or engaging with outside actors in an effort to undermine MSG's business interests in the sale of its marine assets;

    g. Colluding with and/or engaging with company fiduciaries and outside actors to undermine MSG's potential business relationships; and

    h. Colluding with and/or engaged with outside actors in an effort to cut off MSG's supply of products for its marine divisions to MSG's material detriment.

48. As a direct and proximate result of one or more of the aforesaid breaches, MSG has sustained damages.

WHEREFORE, Plaintiff Maurice Sporting Goods, LLC demands judgment in its favor and against Defendant Read Samples in an amount in excess of $75,000, attorneys' fees, the costs of this action, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

## COUNT II – BREACH OF FIDUCIARY DUTY

49. MSG restates and re-alleges Paragraphs 1 through 43 as though fully set forth herein.

50. As the General Manager of the First Source subsidiary of MSG, Samples was a fiduciary and owed fiduciary duties of honesty, loyalty, and care to MSG. Samples had a duty to advance MSG's business interests in all of his endeavors and not to act in a manner that would cause material harm to MSG, including but not limited to, protecting the company's sensitive and confidential information.

51. Samples breached his fiduciary duty to MSG by, among other things:

   a. Undermining MSG's business interests by interfering with ongoing negotiations for the sale of assets;

   b. Engaging in business activity that was competitive with MSG for Samples' own benefit and to advance Samples' interests above MSG's interests;

   c. Acting outside of his authority by engaging third parties to interfere with MSG's ongoing and potential business interests; and

   d. Dealing with third parties to advance their interests and Samples' own interests above the interests of MSG.

52. As a direct and proximate result of one or more of the aforesaid breaches, MSG has sustained damages.

WHEREFORE, Plaintiff Maurice Sporting Goods, LLC demands judgment in its favor and against Defendant Read Samples in an amount in excess of $75,000, attorneys' fees, the costs of this action, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

**COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**

53. MSG restates and re-alleges Paragraphs 1 through 43 as though fully set forth herein.

54. As the General Manager of the First Source subsidiary of MSG, Samples was a fiduciary and owed fiduciary duties of honesty, loyalty, and care to MSG. Samples had a duty to advance MSG's business interests in all of his endeavors and not to act in a manner that would cause material harm to MSG, including but not limited to, protecting the company's sensitive and confidential information.

55. In addition to Samples, Logan Nelson and Mike Knox were fiduciaries of MSG and owed fiduciary duties of honesty, loyalty, and care.

56. Nelson and Knox breached their fiduciary duties to MSG by, among other things, threatening to terminate their employment with MSG to undermine MSG's business interests in the sale of its marine assets.

57. Samples was aware of Nelson and Knox's breaches of their fiduciary duties to MSG and, in fact, contributed substantial assistance and encouragement of their wrongdoing as set forth in the conduct above.

58. As a direct and proximate result of Samples' conduct in aiding and abetting Nelson and Knox's breaches of their fiduciary duties to MSG, MSG has sustained damages.

WHEREFORE, Plaintiff Maurice Sporting Goods, LLC demands judgment in its favor and against Defendant Read Samples in an amount in excess of $75,000, attorneys' fees, the costs of this action, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

## **COUNT IV – CIVIL CONSPIRACY**

59. MSG restates and re-alleges Paragraphs 1 through 43 as though fully set forth herein.

60. Samples conspired with Arnold, the FS Management Team, and with Huntley, among others, to engage in the unlawful acts set forth above.

61. In the course of that conspiracy, Samples committed the overt acts described above including, without limitation:

   a. Secretly negotiating with third parties and FS Management Team members to advance outside interests;

   b. Colluding with FS Management Team members to organize a threat of a walk-out in the event of a sale of MSG's assets;

   c. Colluding with Arnold to cut-off MSG's source for marine products in an effort to force a fire sale of MSG's assets; and

   d. Engaging in a concerted, secret, and collusive plan to undermine any potential sales of MSG's marine business at fair market values.

62. As a direct and proximate result of Samples' conspiracy, MSG has sustained damages

WHEREFORE, Plaintiff Maurice Sporting Goods, LLC demands judgment in its favor and against Defendant Read Samples in an amount in excess of $75,000, attorneys' fees, the costs of this action, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

### COUNT V – TORTIOUS INTERFERENCE WITH ACTUAL OR POTENTIAL BUSINESS RELATIONS

63. MSG restates and re-alleges Paragraphs 1 through 43 as though fully set forth herein.

64. MSG had potential business relationships with T-H Marine and with other potential purchasers of its marine business including Folsom, Big Rock, Waveland and others, as

evidenced by the facts above including, without limitation, the LOI between MSG and T-H Marine.

65. Samples had knowledge of the relationship between MSG and T-H Marine and was aware of the details of the potential transaction. Samples had knowledge of MSG's ongoing efforts to sell its marine and fishing business and had knowledge of the potential purchasers and the terms of those potential transactions.

66. Samples intentionally and unjustifiably interfered with MSG's actual and potential relationships by, among other things:

    a. Working with and assisting Arnold/Signet to hold MSG's main marine products and supply source hostage to undermine potential sales;

    b. Sharing confidential company information with T-H Marine without authority to do so;

    c. Misrepresenting the company's business status and interests to T-H Marine intending to undermine the potential sale;

    d. Conferring with Huntley without authority to do so and providing false and misleading information to Huntley regarding MSG's customer relationships;

    e. Secretly providing to Huntley information intended to induce and inducing T-H Marine to withdraw from the LOI; and

    f. Repeating this pattern of surreptitious conduct with other potential buyers by engaging a plan with Arnold and other FS Management Team members to cut off MSG's marine products supply and threaten a management walk-out, among other things.

67. As a direct and proximate result of one or more of the aforesaid breaches, MSG has sustained damages as a fair market process was subsequently unavailable for the sale of MSG's marine businesses and MSG was forced to sell its assets for millions of dollars below their fair market value.

WHEREFORE, Plaintiff Maurice Sporting Goods, LLC demands judgment in its favor and against Defendant Read Samples in an amount in excess of $75,000, attorneys' fees, the costs of this action, interest on the foregoing at the highest rate allowed by law, and such other and further relief as the Court deems just and equitable.

June 25, 2020

                              Respectfully submitted,

By: _____
DARIO A. PEREZ
Florida Bar No. 58076
dperez@shutts.com
**Trial Counsel**
RENE GONZALEZ LLORENS
Florida Bar No. 53790
rgl@shutts.com
SHUTTS & BOWEN LLP
201 South Biscayne Boulevard, Suite 1500
Miami, Florida 33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982


JEFFREY H. WINICK
Illinois Bar No. 6199126
Co-Counsel
(pending *pro hac vice* admission)
jwinick@hwhlegal.com
MARISA K. PERRY
Illinois Bar No. 6290439
Co-Counsel
(pending *pro hac vice* admission)
mperry@hwhlegal.com
Harris Winick Harris LLP
333 West Wacker Drive, Suite 2060
Chicago, Illinois 60606
Telephone: 312-662-4600
Facsimile: 312-662-4599